Gregory M. Fox, State Bar No. 070876
Arlene C. Helfrich, State Bar No. 096461
BERTRAND, FOX & ELLIOT
The Waterfront Building
2749 Hyde Street
San Francisco, California 94109
Telephone:    (415) 353-0999
Facsimile:    (415) 353-0990

Attorneys for Defendants CITY OF SUNNYVALE, DEVON KLEIN,
CARL RUSHMEYER and KELLY FITZGERALD

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRUCE MILLAR, PATRICIA MILLAR, and DAVID MILLAR,<br><br>  Plaintiffs,<br>  vs.<br><br>CITY OF SUNNYVALE, DEVON KLEIN, CARL RUSHMEYER, KELLY FITZGERALD, and DOES 1 to 20,<br><br>  Defendants. | Case No.: CV10-0827 EJD<br><br>**JOINTLY SUBMITTED CASE MANAGEMENT STATEMENT UNDER RULE 26(f) AND CIVIL LOCAL RULE 16-9** |

PLEASE TAKE NOTICE THAT pursuant to the Court's Order and Federal Rule of Civil Procedure 26(f) and Civil Local Rule 16-9, Plaintiffs BRUCE MILLAR, PATRICIA MILLAR and DAVID MILLAR and Defendants CITY OF SUNNYVALE, DEVON KLEIN, CARL RUSHMEYER and KELLY FITZGERALD jointly submit the following Case Management Statement to the Court.

1.   Jurisdiction and Service

The basis of this Court's jurisdiction is 42 U.S.C. §§ 1983, 1985, and 1988 and the Fourth Amendment to the United States Constitution.  There are no issues with personal jurisdiction or venue.  All defendants have  <u>not</u> been served with plaintiff's Complaint.  The case is <u>not</u> at issue. Defendants believe the next case management conference should be continued until after the Court decides the pending motion to dismiss the plaintiffs' second amended complaint and plaintiffs either

1  dismiss all non-served parties (no summons have been issued for these unserved named defendants)
2  or serve them with sufficient time that they are able to retain counsel, file any necessary motions to
3  dismiss and if further necessary then file answers to the operative complaint so the case is at issue.
4  There are "pendent" state law claims. There is a defense motion to dismiss the amended complaint
5  under FRCP 12(b)(6) – which Defendants have efiled as of May 12, 2011 and noticed to be heard on
6  September 16, 2011 at 9:00 am. This is the third motion to dismiss filed by the defense in this
7  matter. However, Plaintiffs state it should be noted that this motion would not be dispositive because
8  Defendants have never challenged the validity of Plaintiff's Fourth and Fourteenth Amendment
9  claims, based on federal civil rights statutes and jurisprudence, and the same damages are sought
10 under state law, which imposes vicarious liability on the City for its employees' actions. Also,
11 Plaintiffs are seeking to have heard summary adjudication motions, noted below, on the same
12 September 16 date/time.

**2. Facts**

Plaintiff's Summary of the Facts:

Around an hour before midnight on November 28, 2006, Defendant City's police force burst into Plaintiffs' home and beat up David Millar, breaking the bone below his eye and then dragging him into the cold outside air to shiver in the dark with neighbors watching him dressed only in the T-shirt and shorts he had been sleeping in. While that was happening David's parents, the other Plaintiffs, were held in their living room; but Bruce Millar was able to make a frantic call, to 911, reporting the bizarre, harrowing invasion.

Before entering, officers cut through Plaintiffs' screen door and pounded on the front portal. When David's parents awoke and came to their foyer they tried to explain, to the officers, that there must be some mistake: their son, David Millar, could not possibly be the subject of an arrest warrant – particularly for misdeeds in some distant county -- since he had been home-bound and disabled due to severe medical problems for well over a decade.

Rather than take even a moment to check their records (i.e. the "abstract of warrant" documents) the police officers charged into the home, guns drawn, forcing the front door open and into Patricia Millar; proceeded around corners to go to David's bedroom; and, in the officers' version,

1  Klein confronted a nearly naked man pointing a loaded pistol at Klein; but Klein decided to defy the
2  possibility of being fired at and to run toward the gun to take David down.   After tackling David and
3  throwing him down in his bedroom, Officer Klein, assisted by other police officers, proceeded to beat
4  upon David's face and to break one of his bones.

5  Some time after taking David into custody, officers claim that they took the time to <u>actually
6  read</u> any computer-generated items purportedly "relied" on.  Those documents showed that the person
7  they had intended to arrest was someone else, a David GORMLEY Millar who had a different
8  address than David Millar, a different date of birth, different physical characteristics, and a very
9  different facial appearance as well.   Within minutes of taking David into custody, the officers also
10 immediately confirmed, through official channels, that David's pistol was not a stolen weapon, had
11 been lawfully purchased through a licensed dealer, and that David had completed all necessary forms
12 and his purchase had been approved – meaning that he was NOT a convicted felon (such persons
13 cannot purchase weapons, at least not through licensed gun dealers.)  At this time it is not known
14 whether in fact the officers actually had any CJIS records with them – those would have contained
15 reports showing the officers were in search of someone already in custody.  Indeed, it is possible that
16 the officers only first concluded that David Millar was not the David Gormley Millar being sought
17 simply by looking in David's wallet, which one or more officers did shortly after David was assaulted
18 and arrested.  (The officers did not have the actual out-of-county warrant in question but instead only
19 a computer-generated "abstract" allowed by state law; but hereinafter ,  the word "abstract" could
20 refer to both the "abstract of warrant" per se as well as the CJIS records the officers were supposed to
21 have reviewed before attempting an arrest – again, it is not known whether in fact the officers ever
22 read those CJIS materials before going to David's home – the officers later claimed, in an "Internal
23 Affairs" investigation, that they did NOT read the CJIS materials, as they were required to  have done
24 per SPD protocols – and the officers' excuse for not reading those materials – despite their purported
25 signatures on the checklist attesting to having done so – was that the officers had not been adequately
26 trained to do so during the nineteen months that the "checklist" had been in use.)

27 The "abstract" (specifically, the CJIS computer printouts) materials would also show that the
28 David GORMLEY Millar the officers had intended to arrest was <u>already in custody</u>, and that if the

1  officers truly felt a need to confront David GORMLEY Millar anyway all the officers would have
2  had to do was travel to his jail cell.  Indeed, under California law the fact that David Gormley Millar
3  was already in custody limited any further authority for Defendants to act upon the warrant in
4  question to this alone:  to deliver the warrant to the custodial officer of the facility where David
5  Gormley Millar was being incarcerated – and had been incarcerated for over three weeks!

6  Defendant City of Sunnyvale's Police Department had published procedures governing arrests
7  made pursuant to other jurisdictions' requests for assistance in enforcing warrants, especially at night.
8  The officers who invaded Plaintiffs' home just ignored those rules. (Later, the officers contended, in
9  a "IA" investigation and otherwise, that they had not been trained to read CJIS reports and blamed
10 their female clerk for failing to advise them the warrant subject was in custody; that lady declined to
11 confirm telling the officers anything and also denied it was her job to review and report the contents
12 of the CJIS materials  --which protocols required the officers to review as part of using the
13 "checklist" procedures.)  Had they been followed, the officers would have read the materials they
14 were purporting, at the Millars' front door, to be relying on.  Before entering the home, the officers
15 would have honored requests David's parents made, on his and their behalf, to see the "warrant".
16 Only after breaking into the home and beating up David Millar did those officers accede to the
17 request to show what they "relied" on (at that time, only the "warrant abstract" per se – the officers
18 never showed any Plaintiff the CJIS  materials) and even after becoming aware of their errors, certain
19 officers harassed David verbally in an attempt to force him to admit that he was in fact the person
20 named in the warrant abstract documentation, and also denied David medical attention (implying he
21 would get it only if he "fessed up" first.) Fortunately, upon arriving at the scene, presiding officer Lt.
22 Hern ordered medical help.   (Lieutenant Hern also later admitted the arrest was a mistake and
23 promised that the City would pay for David's medical treatment.)

24 Despite requests, in 2008, for related audio recordings of the incident, Defendants – at the
25 urging of the mediator all parties hired long ago – recently produced purported copies of some of
26 those digital files.  They show City police officers only actually trying to "confirm" computer-
27 produced warrant abstracts after taking David into custody. The same digital files also show that the
28 audio recordings may have been altered, even amateurishly.  (Upon the urging of the mediator

1  initially hired by the parties – a former Deputy District Attorney/Prosecutor -- Defendants agreed to
2  finally release their internal investigation reports; Plaintiffs stipulated to a protective order on that and
3  personnel records items, but not everything has been presented yet; and at the mediator's suggestion,
4  Plaintiffs counsel furnished the Defendants with a list of all outstanding materials that should exist, in
5  Defendants' files, to shed light on the events in question – but again, records that should exist have
6  simply never been produced, nor has their absence ever been explained.)

7  In one audio recording produced to date, when one supervising officer (Hern) is asked by
8  another about "What happened?" at the Millar home, the response stated was that no explanation
9  would be given since the men were on a "recorded line." The same records show the officers
10 scrambling to reach at least one legal advisor and union representatives, and with other officers, to
11 consult before any officers wrote their reports (including the story telling the tale of charging into a
12 loaded gun that was "aimed" at the officer before beginning his rush.) Interestingly, none of the
13 statements attributed to Plaintiffs Bruce and Patricia Millar, in the "official version" of the City's
14 story of the alleged "knock and notice" process, can be found in any of the recordings preserved by
15 the City; nor is there any evidence of Bruce and Patricia's alleged "highly unusual and agitated
16 manner" in dealing with the policemen's alleged "knock and notice" procedures. Likewise absent
17 (including in any police version of the incident) is any evidence that any policeman ever told any
18 Plaintiff, before charging into Plaintiffs' home, that the police were seeking to arrest a "David
19 GORMLEY Millar" (Plaintiff David does not use a middle name.)

20 Defendants' Summary of the Facts:

21 Plaintiff David Millar resides in Sunnyvale with his parents, plaintiffs Bruce and Patricia
22 Millar. This matter arises from an incident which occurred on November 28, 2006. On that date,
23 Sunnyvale police undertook efforts to execute an arrest warrant for a "Millar, David Gormley" who
24 resided in Sunnyvale, and who is hereinafter referred to as "the warrant subject". The involved
25 officers performed their usual and customary warrant check which led them to believe the warrant
26 subject was living with his parents whom the officers believed were Bruce and Patricia Millar who
27 also lived in Sunnyvale. The officers were mistaken given the warrant suspect had been
28 reincarcerated shortly before the day of the incident. On arrival at the Millars residence the

Sunnyvale officers were all fully dressed in official police uniforms and intended to do a "soft knock and talk" contact to determine if the warrant subject was present at the Millar home and to confirm his identity and then serve the warrant. However, in response to the police knocking on the door and inquiring as to whether the warrant subject was at home, Bruce and Patricia Millar reacted in a highly unusual and agitated manner, including shouting out to their son, David Millar, in loud voices: "David! The police are here!" When the officers attempted to calm the Millars, they instead became more agitated. Their reaction to the officers' presence was so unexpected and extreme that the officers concluded they were at the house of the warrant subject and the Millars were attempting to warn the subject, whom the officers knew to be a dangerous felon, to escape or arm himself.

All of the officers present felt the situation had quickly become exigent and created a significant danger to the officers' safety. The supervising officer ordered the officers to enter the house in an effort to gain control of the escalating and potentially dangerous situation. As the officers entered through the front door one officer, Devon Klein, was suddenly confronted by David Millar who was emerging from his bedroom. David Millar appeared to be holding something in his hand but was hiding it from the officer. When Officer Klein asked what he had in his hand, David Millar responded: "I have a gun", and he began to point his fully loaded Glock 9mm semi-automatic firearm toward the officer. Officer Klein threw himself at David Millar, tackled him and both fell to the floor as Officer Klein shouted "GUN!" to alert the other officers. Fearful that David Millar still had the gun and was preparing to shoot, Officer Klein shouted "Drop the gun" and punched David Millar once in the face, at which point, David Millar called out that he had dropped the weapon. The gun was recovered and David Millar was handcuffed and walked from the house. The weapon, a Glock semi-automatic, had a round chambered ready to be fired.

Plaintiff David Millar is claiming approximately $400,000 to date, in medical expenses arising out of injuries allegedly suffered as a result of the incident. A review of David Millar's medical records indicates that he is suffering from an eye injury, allegedly arising out of the blow received from PSO Klein. This injury has been diagnosed as "left orbital blowout fracture with mild diplopia on extreme left lateral gaze", for which he has not yet received recommended surgery. The eye injury apparently causes blurry vision and difficulty focusing in his left eye. David Millar also

claims exacerbation of a pre-existing but dormant intestinal disorder. The defense will require a medical examination of the plaintiff by a gastro-intestinal expert, eye expert and psychiatrist.

Principal Factual Issues in Dispute Include, But Are Not Limited To, The Following:

- Was the officers' warrant confirmation investigation reasonable.
- Was any initial knock and notice conducted, and if so was it conducted reasonably? (Plaintiffs contend Defendants unlawfully cut through Plaintiffs' screen door in violation of known prohibitions under California state law, and did so before "knocking" and did so even though Plaintiffs' nearby doorbell was visible and fully functional.)
- Whether Bruce and Patricia Millar's reaction to the officers caused the officers to reasonably believe the warrant suspect was inside the house and attempting to escape or arm himself?
- Whether the forcible entry by the officers into the residence was reasonable?
- Did the police properly identify themselves and were they clearly dressed as police officers?
- Did Bruce and Patricia Millar on behalf of the Plaintiffs ask to see the warrant prior to the police entry into the residence, and did the police unreasonably refuse to show the warrant abstract documentation when it was initially requested to be shown?
- Whether David Millar aimed a loaded weapon at Officer Klein.
- Was the use of force by Office Klein against David Millar reasonable?
- Was the use of force by Officer Klein malicious, given plaintiff's contention that Officer Klein made a proclamation immediately thereafter, to David Millar, "I kicked your ass!" and other remarks falsely accusing David Millar of being a "felon"?
- Was the arrest and detention of David Millar and his parents reasonable, including the duration of the restraints and detention? (Jury instructions CACI 1406 and 1407.)
- Did the "weapons check" completed, while David Millar was still outside his home in the custody of the officers, confirm that David Millar, of 1140 Polk Street in Sunnyvale, had lawfully purchased his pistol, through a dealer, thereby establishing per se that he could not be a "convicted felon" and thus compelling his immediate release?
- Did Plaintiffs Bruce and Patricia Millar suffer emotional distress during the course of perceiving, through their immediate senses of sight and hearing, the harm being done to their

son by the City's employees?

- Has Defendant City failed to comply, at any time prior to filing suit, with California's statutory counterpart of the federal Freedom of Information Act?
- Regarding the plaintiff's claims against the City was there notice to the City prior to the incident of any deficiency in the training or regular performance of any of the officers and was the City deliberately indifferent to the need for more or better training of the officers and more effective supervision?
- Did the City, through its agents, participate in suppressing evidence of the nature of the events that occurred November 28-29, 2006 in connection with this litigation?  (In other words, has there been a "cover-up" of the errors and omissions of City employees in this matter, so as to, for example, constitute ratification of any underlying negligence or other misconduct?)
- What damages if any were proximately caused by any Defendant's actions?

### 3.   Legal Issues

- Since the proper use, by Defendants, of the "warrant checklist" on November 28, 2006 would have, <u>as a matter of undisputed fact</u>, prevented the occurrence of every other event causing Plaintiffs harm on that evening and thereafter, did the absence of proper use of that "warrant checklist" result, <u>as a matter of law</u>, in Defendants' liability for violations of Plaintiffs' civil rights, particularly under the Fourth and Fourteenth amendment and state law guarantees against wrongful invasions of homes, against unlawful searches, seizures and batteries, and against false arrest and false imprisonment, regardless of what happened in the course of attempting to execute the "warrant," regardless of any claim of "good faith mistake," and regardless of the Plaintiffs' response to the nighttime invasion of their residence?
- Was the forcible entry into the residence lawful?
- Was lawful execution of the "warrant abstract" negated as a matter of law, in terms of providing authority to arrest someone not named therein, where the person actually named therein was shown, by the computer-generated "abstract of warrant" documents produced in connection with the arrest, to be already in custody in another jurisdiction, where the officers' duty was thus merely to facilitate compliance with Penal Code Section 850(c), and where the

same "abstract of warrant" documents supposedly were read and relied upon to justify treating the arrestee as a dangerous convicted felon?

- Was the use of force and amount of force reasonable under the circumstances known to the officers at the time force was applied to the plaintiffs?
- Are the individual officers entitled to qualified immunity regarding any and/or all of the claims brought against them by plaintiffs?
- Were any promises made by Lt. Hern, to pay David Millar's medical expenses, binding on the City?

### 4. Motions

Defendants have filed a motion to dismiss the second amended complaint that is set to be heard on September 16, 2011 at 9:00am. Defendants also intend to bring a motion for summary judgment. Plaintiffs are also considering summary adjudication motions to obtain a determination that the "abstract of warrant" documentation used to initiate the arrest process was only "valid" to the extent, if any, of authorizing Defendants to facilitate the presentation of the warrant to David Gormley Millar by the distant officer in Tracy who was, in the language of Penal Code Section 850(c), David Gormley Millar's "custodial officer." Plaintiffs also will bring a motion re the alleged failure of the City to follow this Court's ADR rules (more specifically, per Plaintiffs, by failing to bring, to the mediation, persons required both under the Local Rules and under the rules of the private mediation service the parties employed; and the sanctions Plaintiffs will seek are those authorized under comparable State law and case decisions.)

### 5. Amendment of Pleadings

Plaintiffs may amend the complaint depending on the outcome of the motion to dismiss.

### 6. Evidence Preservation

The Sunnyvale Police Department has internally notified its staff to preserve all documentary evidence.

### 7. Disclosures

Rule 26 Disclosures: The defendants have made their initial Rule 26 disclosure including disclosing the names of witnesses, applicable police reports, and other documentary evidence relevant

to the case that is still in their possession or that can be obtained pursuant to the exercise of ordinary care by any party. Plaintiffs have not made any Rule 26 Disclosures. The parties have cooperated on informal discovery, except as Plaintiffs contend herein.

### 8. Discovery

The scope of discovery is unknown at this time due to the degree of evidence that has been presented to the Plaintiffs by the Defendants; other claims against Defendants may follow.

Defendants contend they have provided all applicable police reports, team roster for the night of the incident, CAD printout, warrant information for David Gormley Millar (including vehicle registration, DMV photo and RAP sheet), internal police memorandums regarding warrant procedure, training manuals regarding warrant procedure, transcript of radio traffic on the night of the incident and photographs taken by police regarding the incident. Defendants claim to have also propounded to plaintiff s a disk of all radio and 911 and other communications from the night of the incident. Plaintiffs dispute these contentions.

The parties propose each side be allowed at least the following discovery:

Depositions of the three plaintiffs and three individual defendants.

Each side may take 5 additional witness depositions, excluding expert depositions.

The parties propose that each side be allowed 50 interrogatories; 20 separate specifications for requests for production of documents; 35 requests for admission and that each set of discovery be per each individual named plaintiff or defendant.

Expert discovery as agreed or as provided by the FRCP.

Defendants will meet and confer with plaintiffs' attorney on the issue of medical and psychiatric examinations of the plaintiffs by doctors retained by the defense. Plaintiffs contend they have provided Defendants with all extant medical records and allowed Defendants to subpoena whatever records Defendants desire, even prior to the initial Joint Case Management Conference.

### 9. Relief

Plaintiff seeks general money damages, special damages for medical costs and property damage, and attorneys' fees.

///

## 10. Settlement and ADR

The parties had a mediation with retired Judge Gene McDonald through JAMS. The parties will advise the court if they believe the case would benefit from another ADR or a mandatory settlement conference with a Magistrate Judge.

## 11. Narrowing of Issues

The parties will meet and confer on narrowing the issues. The issue of qualified immunity should be decided upon summary judgment motion and the defense believes this motion should be filed after the initial fact witnesses depositions are completed and before expert discovery. Likewise, Plaintiffs will seek summary adjudication along lines suggested above. However, even if the City succeeds in immunizing the arrest, issues will remain regarding the reasonableness of the continuing restraint and detention of Plaintiffs (Plaintiff contends the City has not produced the materials which will show when the "weapons check" took place before midnight.) The City also believes discovery and litigation of any Monell claims have been resolved by its earlier motion to dismiss in which the Court dismissed the Monell claims (which Plaintiffs may seek to renew after formal discovery.) Given the Court's ruling any further Monell discovery if relevant for some reason should be bifurcated until the plaintiffs' individual liability claims are resolved. Plaintiffs may not need Monell claims in light of California law imposing vicarious liability on Defendant City. Defendants likely will also move for summary judgment on other remaining liability issues after depositions of the fact witnesses are completed. **Again**, Plaintiffs are also considering summary adjudication motions to obtain a determination that the "abstract of warrant" documentation used to initiate the arrest process was only "valid" to the extent, if any, of authorizing Defendants to facilitate the presentation of the warrant to David Gormley Millar by the distant officer in Tracy who was, in the language of Penal Code Section 850(c), David Gormley Millar's "custodial officer"; that Defendants are liable as a matter of law, so that the only issues remaining for trial would be actual and punitive damages; and that, likewise, no immunities, qualified or otherwise, can be bestowed upon currently served Defendants.

///

///

12. Expedited Schedule

Scheduling

Proposed dates for:

    A. Non-expert discovery cutoff:    May 2012.

    B. Designation of experts:    Thirty day after a ruling on the MSJ

    C. Hearing of dispositive motions:    June 2012

    D. Expert discovery cutoff:    Thirty days after disclosure

    E. Final Pretrial Conference:    September, 2012

    F. Trial:    September, 2012

13. Trial

This case will be tried to a jury and is expected to last five (5) to ten (10) court days.

Plaintiffs make the following statement:

PLEASE NOTE: PLAINTIFFS BRUCE AND PATRICIA MILLAR ARE NEARLY EIGHTY YEARS OF AGE AND MAY ASK THE COURT FOR EARLIER TRIAL SETTING, EARLIER DISCOVERY DEADLINES, ETC. DUE TO THEIR AGES AND DEVELOPMENTS IN THEIR MEDICAL CONDITION/CONDITIONS; PREFERENTIAL TRIAL SETTING WOULD BE THEIR ENTITLEMENT UNDER CALIFORNIA LAW.

14. Disclosure of Non-party Interested Entities or Persons

No party has filed "Certification of Interested Entities or Persons" required by Civil Local Rule 3-16 because no non-party entities or persons with such interests are known to exist at this time.

15. Miscellaneous matters that may facilitate the just, speedy and inexpensive disposition of this matter

None.

Dated: May 12, 2011    LAW OFFICES OF NICHOLAS DAMER

    By:     /s/
    Nicholas Damer
    Attorney for Plaintiffs

Dated: May 12, 2011  BERTRAND, FOX & ELLIOT

By: _____/s/_____
    Gregory M. Fox
    Arlene C. Helfrich
    Attorney for Defendants
    CITY OF SUNNYVALE, DEVON KLEIN,
    CAROL RUSHMEYER and KELLY FITZGERALD

ATTORNEY ATTESTATION

I hereby attest that I have on file all holograph signatures for any signatures indicated by a conformed signature ("/s/") within this E-filed document.

Dated: May 12, 2011  _____/s/_____
    Gregory M. Fox